## CHICAGO AND EASTERN ILLINOIS RAILROAD COMPANY *v.* VESTER, ADMINISTRATOR.

[No. 6,875.   Filed February 15, 1911.]

1. RAILROADS.—*Street Crossings.—Contributory Negligence.*—Where a street was crossed by three railroad tracks, the first of which was occupied by a train separated so as to permit the crossing of the street, and a train had just passed on the next track, a teamster who attempted immediately afterwards to cross and was struck by a section of cars negligently permitted to become loose and which was running twenty miles an hour, the ordinance rate being ten, is not guilty of contributory negligence as a matter of law.   p. 146.

2. RAILROADS.—*Breaking of Trains.—Injuries at Street Crossings. —Complaint.—Theory.*—A complaint alleging that defendant

railroad company knowingly used defective appliances by reason of which its train broke into two parts, that such company negligently managed each part, and negligently allowed such train and each part thereof to run over a street crossing at the rate of twenty miles an hour, the ordinance rate being ten miles an hour, thereby killing plaintiff's decedent who was crossing the track, sufficiently shows negligence after the break of the train, especially where that theory was acted upon by the trial court and the parties thereto. p. 147.

3. RAILROADS.—*Broken Trains.—Speed Ordinances.*—Speed ordinances do not directly apply to loose cars or broken trains, but if such cars are running because of a momentum received from their train, such, fact becomes evidence of a violation of the ordinance, such operation of cars not being permitted under any circumstances. p. 148.

4. RAILROADS.—*Loose Cars.—Violating Speed Ordinance.—Evidence.—Jury.*—Whether loose cars received their momentum from the train of which they had been a part, causing them to run over street crossings at an excessive speed, is a question for the jury. p. 150.

5. RAILROADS.—*Loose Cars.—Excessive Speed.—Res Ipsa Loquitur.*—The doctrine of *res ipsa loquitur* does not apply to establish negligence in a case where a teamster is killed on a street crossing by uncontrolled, loose cars accidentally broken loose from the train, and running at an excessive speed through the city. p. 150.

6. RAILROADS.—*Running Loose Cars over Street Crossings.—Negligence.*—It is negligence *per se* for a railroad company knowingly to run loose, uncontrolled cars over street crossings. p. 151.

7. RAILROADS.—*Running Trains in Sections.—Street Crossings.*—It constitutes negligence *per se* for a railroad company to run a train in two sections at an excessive speed so close to each other that persons attempting to cross the street after the passage of the first section are struck by the second. p. 151.

8. RAILROADS.—*Crossing Accidents.—Negligence.—Want of Evidence.—Inferences.*—Where a railroad company fails to introduce any evidence of the killing of a traveler on a street crossing, though it has full knowledge of the facts, the jury may, from the company's silence, infer negligence, though it has not been actually established by the plaintiff's evidence. p. 152.

9. RAILROADS.—*Breaking Train.—Inferences. — Negligence.—Evidence.*—Where there was evidence that a coupler which broke, thereby severing the train, was so strong that an extraordinary jerk was required to break it, the jury was authorized to infer negligence in the management of the train. p. 153.

10. TRIAL.—*Interrogatories. — Unsupported by Evidence. — New Trial.*—Where the answers to the interrogatories to the jury are

not supported by the evidence, the court may order a new trial. p. 153.

11. DAMAGES.—*Excessive.*—*Parent and Child.*—*Railroads.*—Where a railroad company ran loose, uncontrolled cars over a street crossing, thereby killing a son twenty-four years old, with an expectancy of forty years, and contributing to his widowed mother fifty-four years old, with an expectancy of eighteen years, $150 a year, which was her sole support, a judgment for $4,000 is excessive. p. 154.

12. DAMAGES.—*Speculative.*—*Parent and Child.*—Where a mother sues for the death of her son, the jury should not consider what might happen as to the son's care for her in the future, such damages being speculative. p. 157.

From Fountain Circuit Court; *Jere West,* Special Judge.

Action by John C. Vester, as administrator of the estate of Bernard Polk, deceased, against the Chicago and Eastern Illinois Railroad Company. From a judgment on a verdict for $4,000 for plaintiff, defendant appeals. *Reversed.*

*Homer T. Dick, Lucas Nebeker* and *E. H. Seneff,* for appellant.

*Livengood & Bryant* and *Charles R. Milford,* for appellee.

HOTTEL, J.—This is an action brought by John G. Vester, as administrator of the estate of Bernard Polk, deceased, against appellant to recover damages on account of the death of said Polk, caused by being struck by one of appellant's trains, at a point in the city of Attica, Indiana, where a street of said city crosses appellant's tracks.

This action was brought by said administrator for the benefit of and to recover for Rosa A. Polk, the mother of said decedent, damages accruing to her by way of loss of support resulting from the death of her said son.

The complaint was in five paragraphs. A demurrer was filed to each of the paragraphs, and was sustained as to the first and third paragraphs and overruled as to the second, fourth and fifth, and exceptions given to the ruling on each paragraph. The case was then put at issue by a general denial. There was a trial by jury, answers to interrogatories, general verdict for appellee in the sum of $4,000, motion

for new trial overruled, and exceptions and judgment on the verdict, from which this appeal is taken.

The substance of the facts as to the time, place and circumstances of the injury, as set out in the complaint, and each of the paragraphs thereof, may be summarized as follows: Decedent was injured at a crossing on appellant's railroad on Washington street in said city, which street runs east and west, and is about eighty-two and one-half feet wide. Union street, in said city, runs north and south. Appellant's road runs on Union street in said city, from where it enters the city at the south, to and beyond Washington street on a down grade toward the north. Three of appellant's tracks cross said Washington street. The center track is the main line, and there is a side-track on the east, thirteen and one-half feet from the center track, and another side-track on the west, about thirty feet from the center track. The freight-house is eighty-seven feet south of Washington street, and on the east side of all of said tracks.

We quote from appellant's brief as follows: "On the afternoon of October 19, 1906, decedent had occasion to pass over said Washington street, crossing from the east side of said Union street, with a wagon loaded with corn, drawn by a team of mules, to the grain elevator on said Washington street, west of said crossing. When he arrived at about the north line of Washington street a train of freight-cars was approaching the crossing from the south on said main track, and he stopped about sixteen feet north of the center of Washington street, with his team facing south, and waited there for said train to pass. A train of freight-cars was standing on said east track, cut so as to leave a space of about twenty-five feet about the center of said street, the locomotive and one car being north of said space, and the remainder of such train—twenty cars or more—south of said opening, which train obscured his view of the main track, except as he could see through said opening at an

angle of about forty-five degrees. Said approaching train gave the proper signals, and passed over said crossing at a rate of speed of more than ten miles an hour, and about twenty miles an hour. Some time prior thereto said train had broken in two parts, the exact time and place of such parting being unknown, and when the first portion of the train had passed about three hundred feet, decedent started his team across the tracks, being unable to look south for a greater distance than twenty or thirty feet until his team was on the main track, on account of the obstruction by said freight-train on said east track, some cars on said spur track, and said station. He drove through said gap with due care, and saw and heard nothing indicating the approach of any other train, or any part of a train, and was struck and killed by said detached portion of said train. No warning was given him by any one of the approach of said detached portion of said train, and he had no knowledge that it was approaching, and supposed that the entire train had passed.''

While the allegations of negligence and its causative connection with the injury are not identical in the three paragraphs of complaint, yet we think, for the purposes of this opinion, that it is necessary to set out those contained in the fifth paragraph only.

The allegations of the fifth paragraph, as to negligence and proximate cause, are as follows: ''That said train was broken in two wholly on account of negligence of defendant as follows: (1) The careless and negligent construction and equipment of said train, and in and by the fact that defendant negligently and carelessly used defective brakes, brake-shoes, rods, beams, and connecting appliances, which, on account of their defective condition, did not hold the two parts of the train together, of which defective condition defendant had knowledge at the time. (2) By and on account of the negligence of defendant in and by the careless and negligent handling, operation, management and control of said train and each part thereof. (3) By reason of the neg-

ligence and carelessness of defendant in allowing and permitting said train and each part thereof to run past said crossing at said high rate of speed, namely more than ten miles an hour, and about twenty miles an hour, in violation of an ordinance of said city of Attica, hereinafter set out.'' Also, the following: ''That decedent was struck by said detached part of said train, and injured thereby as before described, wholly on account of the negligence of defendant in this, to wit: (1) By carelessly and negligently permitting said train to break in two and run wild, because of the defective and negligent equipment of said train, because of the negligent and careless handling of said train, and because of the unlawful and high rate of speed of the train and both parts thereof. (2) By carelessly and negligently managing and running said train and each part thereof, in that neither part was under the control of defendant, so that it could be stopped and controlled when necessary and proper. (3) By carelessly, negligently and unlawfully allowing and permitting said train, and each part thereof, to be run and to go within said city limits and past said Washington street as aforesaid, at said high and unlawful rate of speed, namely more than ten miles an hour, and about twenty miles an hour, and thus negligently allowing said detached part to strike and kill said Polk, as aforesaid.''

The first and only error argued is that ''the court erred in overruling appellant's motion for a new trial.'' The grounds for new trial are as follows: '' (1) The damages assessed by the jury are excessive; (2) the verdict of the jury is not sustained by sufficient evidence; (3) the verdict of the jury is contrary to the evidence; (4) the verdict of the jury is contrary to law; (5) the assessment of the amount of recovery is erroneous, being too large.''

Counsel first discuss the sufficiency of the evidence, and say that the evidence affirmatively shows contributory negligence on the part of decedent. It seems to us that the statement of facts, which is admitted to be

correct, is all that is necessary to show that decedent acted as any prudent man, similarly situated, might act.   In fact appellant's counsel concede that the conditions were such that decedent probably could not have seen in time to save his team; but that if he had been looking and had exercised proper care he could have escaped in time to prevent injury to himself.   It is much easier, from a position of safety, to speculate upon what would have been prudent and considerate action, than to form the opinion and promptly act upon it when the danger is present and the peril imminent. Under such circumstances, eminently prudent men might act differently.   There is no better tribunal to judge of the prudence of the acts and conduct of a man so situated than a jury of twelve men.   Their judgment and conclusion should be final, unless the facts and circumstances are such as to compel a different opinion by the appellate tribunal.   The facts in this case do not justify such a conclusion.

Counsel next discuss ''Defendant's Negligence.''   Under this head, counsel concede that the complaint sufficiently charges negligence in the breaking of the train, in 2.   that it charges ''(1) the use of defective appliances, with knowledge of such defects; (2) careless and negligent management of the train, and each part thereof; (3) that the train, and each part thereof, were negligently allowed to run past said crossing at a rate exceeding ten miles an hour, thereby violating the speed ordinance of the city.''

But counsel insist that all these allegations have reference directly and exclusively to the cause of the break of the train, and must therefore be limited to conditions or acts at or before the time of such break.   They insist, therefore, that it is not the theory of either paragraph of the complaint that there was careless and negligent management of the separated or lost division of the train after the break, but that the theory of each paragraph upon this

subject of negligent management of each part of the train relates to the management prior to, and not after, the break, and that therefore any evidence of negligent management or operation of the second division of the train after the break was a departure from the negligence charged, and should not be considered in determining the sufficiency of the evidence to sustain the verdict. If counsel are right in their theory of the complaint, such evidence would have been subject to objection, and should have been excluded. There is some ambiguity and uncertainty as to this theory of the complaint, but we think the allegations in the fifth paragraph are sufficient to indicate that the pleader was proceeding upon the theory that the separate parts of the train were negligently operated and managed, both before and after the separation. This theory seems to have been adopted by both appellant and appellee, and by the trial judge as well, at the trial of the cause, as indicated by the evidence and the interrogatories propounded by appellant's counsel.

Where there is only uncertainty and ambiguity in the meaning or theory of a pleading, the theory will be adopted by this court that the parties and the trial court adopted at the trial. *Lake Erie, etc., R. Co.* v. *McFall* (1905), 165 Ind. 574; *Southern R. Co.* v. *Jones* (1904), 33 Ind. App. 333.

Counsel next insist that too much importance should not attach to the speed ordinance and the proof of a violation thereof, and in this connection insist that the city 3. ordinance cannot be construed as applying to or affecting parts of a train, by accident separated from the engine and front part of the train. Counsel for appellee, on the other hand, contend that the operating of the loose or separated part of the train, which collided with decedent, in excess of the speed limit of the city ordinance, was in fact a violation of the ordinance, and therefore negligence *per se*.

We think that the position of appellant's counsel upon this feature of the case is correct, subject, however, to some

qualification and modification. We do not think that the city ordinance in question contemplates controlling or regulating the speed of part of a train separated by accident from the main part of the train, and being itself without any engine, because such a regulation necessarily contemplates permission to run such wild or loose section of a train within the city limits, subject to the condition only that it be operated within the speed limits fixed by the ordinance. We do not think the city ordinance in question contemplated any such permission. A wild or separated section of a train, running without an engine, is in itself necessarily dangerous, and neither statutory, town nor city regulation contemplates licensing or permitting its operation, or intends the regulation or control of its operation, except as it is necessarily connected with and controlled by the train of which such detached section formed a part, and from which it became separated. To this extent we think the position of appellant's counsel should be qualified.

To apply the principle which we think applicable in such cases, we will take this case. Any speed which the separated part of the train, which collided with and killed decedent, acquired as a result of the speed of the train from which it became separated, would, we think, be within the purview and control of the ordinance, introduced in evidence, governing the speed of trains; and if the speed of such separated section was in excess of the speed provided by the ordinance, such fact would be evidence of a violation of the ordinance. On the other hand, any speed such separated part of the train acquired of its own momentum, after separation, and because of any incline in the grade of the track, would not be within the purview and control or regulation of the ordinance; but such speed might be evidence of bad management, and lack of prompt and efficient control by those in charge of such separated part of the train, and from such lack of prompt and efficient control of such loose part, the negligence of appellant might be inferred by the jury.

Under the evidence in this case, these were questions of fact for the jury, and their conclusion, under the rules of this court, which presumes everything in favor of that conclusion, rather than against it, will not be disturbed. We think the conclusions before expressed are in perfect harmony with the following cases relied upon and cited by both appellee and appellant. *Ohio, etc., R. Co.* v. *McDaneld* (1892), 5 Ind. App. 108; *Lang* v. *Missouri Pac. R. Co.* (1906), 115 Mo. App. 489, 91 S. W. 1012; *Shirk* v. *Wabash R. Co.* (1896), 14 Ind. App. 126.

It is next contended that there was no evidence to warrant the jury in finding as it did, because there was no evidence proving any careless or negligent management of the train by appellant, which caused its separation; that appellee in fact proved only the accident and the death resulting therefrom, and no negligent act that caused the separation of the train; that the only justification for a finding for appellee on his own evidence is by invoking the doctrine of "*res ipsa loquitur,*" which doctrine it is insisted, and we think correctly, does not apply to this kind of a case.

Upon this branch of the case counsel for appellee, while not contending that this rule of *res ipsa loquitur* strictly applies to the case at bar, insist that proof by appellee that the separated portion of the train was running in excess of the speed limit fixed by the ordinance of the city of Attica was proof of negligence *per se* upon the part of appellant, and, in support of this contention, they cite a line of authorities that seem to support their position. We think, however, that a careful examination of the cases cited will disclose a difference between the facts in those cases and the facts in this case. Among the cases relied on by appellee's counsel is *Lang* v. *Missouri Pac. R. Co., supra.* In that case it was contended by the railway company that the loose car which caused the collision "was not set in motion by the engine and then detached to travel forward, but was given 'slack' to

start it and then gained headway by force of gravity, the track being down grade towards the crossing,'' and that the car was not ''kicked or shunted,'' as claimed by the injured party and alleged in his petition. Commenting upon this difference of views entertained and asserted by the respective parties, the court said: ''In the view we take of the case, notwithstanding the allegation in the petition that the car was 'kicked' or 'shunted,' it is immaterial whether it was given headway by that operation or was started in the manner claimed by defendant. The means of propulsion used do not enter into the question of negligence. * * * This fact is admitted by defendant and its negligence thereby confessed.''

We think, in view of the facts in that case, that the principle announced by the court was right, because, according to the views of either of opposing counsel, the negligence 6. consisted in knowingly and purposely sending the loose car on its way over the crossing without any warning and without any means for its control. In such a case it would undoubtedly be negligence *per se,* as the court in that case held.

In the case at bar, the separated portion of the train was not, by appellant, purposely and intentionally sent on its way, but its going in the manner in which it did was the result of accident, and herein lies the distinction which calls into operation a rule different from that asserted in the case last cited.

For the same reason the case at bar is not controlled by the principle laid down in another line of cases cited by counsel for appellee—the rule that obtains in the 7. operation of one train so closely behind another that the signals and warnings that the law requires are unavailing. In such cases the operation of each of such trains in such manner is voluntary on the part of the agents of the railroad company, and each train is within the control of those operating it, and there is no element of accident

that puts the movement of the rear train beyond the control
of those operating it. In such cases the act of moving the
trains in such close proximity is very properly held to be
evidence of negligence *per se,* as held in the case of *Chicago,
etc., R. Co.* v. *Boggs* (1885), 101 Ind. 522, 51 Am. Rep. 761.
See, also, *Ohio, etc., R. Co.* v. *McDaneld, supra,* and other
cases cited by appellee.

The facts in those cases are entirely different from the
facts in this case. We think that counsel for appellant have
stated the rule applicable in this class of cases with
fairness, when they say in their brief: "There are
two conditions, under which the law authorized
a finding of facts constituting negligence without evidence
[of actual negligence], and only two. * * * The other
condition, however, is one which relates to this kind of case.
* * * The case of *Indianapolis St. R. Co.* v. *Darnell*
(1904), 32 Ind. App. 687, was one of a crossing accident and
injury, and the doctrine was there announced, that the jury
may infer the negligence, not from the accident, but from
the silence of defendant, and its failure to introduce evi-
dence. This doctrine is not that a presumption has arisen
or exists, which defendant is required to rebut, but that
having better opportunity of knowing the facts relating to
the occurrence than plaintiff has, it ought to introduce evi-
dence concerning the affair, whether plaintiff has established,
by his evidence, any of the negligence or not. This doctrine
seems to proceed upon the idea that under the circumstances
making it difficult for plaintiff to prove his charges of negli-
gence, defendant owes the duty of furnishing material, which
may be adopted and used as the basis for a conclusion as to
negligence."

Since the law applicable to this case is as heretofore laid
down, we pass to the question of whether the evidence shows
that appellant's negligent and careless management and
operation of its train was the cause of its separating and of
decedent's consequent death.

There were witnesses who testified to the strength of the coupler, and that an extraordinary jerk or strain was necessarily required to break it. From this and other evidence the jury had the right to infer that the break was due to a negligent operation of the train, either at the time of or before the separation, and since appellant's agents were the only persons in charge of the operation and management of the train, this negligence was attributable to appellant.

It is only necessary that "the evidence must affirmatively establish circumstances from which the inference fairly arises that the accident resulted from the want of some precaution which the defendant ought to have taken." *Louisville, etc., R. Co.* v. *Schmidt* (1893), 134 Ind. 16, 22, quoting from the case of *Wabash, etc., R. Co.* v. *Locke* (1887), 112 Ind. 404, 2 Am. St. 193. While the evidence was meager, we think there was enough to prevent our disturbing the verdict on this ground.

Counsel next discuss the answers of the jury to interrogatories. It is not their contention that these answers conflict with the general verdict, but they insist, in effect, that there are several answers that are wholly unsupported by any evidence, and that the answers, as a whole, indicate that the jury entirely disregarded the evidence offered by appellant, and manifested a disposition to find facts, whether supported by the evidence or not, that would strengthen and uphold the general verdict in favor of appellee, and that for this reason the general verdict should not be allowed to stand.

If counsel are right in their contention as to what the answers to the interrogatories disclose, they have in their favor authority that supports their contention as to what the duty of this court is in such a case. In the case of *Chicago, etc., R. Co.* v. *Kennington* (1890), 123 Ind. 409, the Supreme Court, at page 410, said: "If it were found that answers to interrogatories were inconsistent with each other, and were

not supported by the evidence, the fact might be influential
in inducing the court to grant a new trial in order to prevent
a failure of justice. It is possible that a case might arise in
which there would be such a manifest repugnancy between
answers to interrogatories as to indicate a disposition on the
part of the jury to distort the evidence in order to make a
case favorable to one party or the other. Where answers
to interrogatories, fairly put, make such a purpose clearly
apparent, there are authorities of great weight which hold
it to be the duty of the court to set the verdict aside and
award a new trial. *Burns* v. *North Chicago Rolling Mill Co.*
[1884], 60 Wis. 541, 19 N. W. 380; *Mitchell* v. *Brown* [1883],
88 N. C. 156; *Sloss* v. *Allman* [1883], 64 Cal. 47, 30 Pac. 574.
We should unhesitatingly adopt this view in a proper case.''

We have carefully examined the interrogatories and an-
swers thereto in this case, and we do not feel warranted in
saying that any material interrogatory is wholly unsup-
ported by fact or inference properly deducible from some
fact or facts proved. And while the answers to one or two,
taken in connection with the evidence, indicate that the jury
were inclined to ignore the evidence of appellant's witnesses,
yet we do not feel justified in holding that the answers of
the jury, in and of themselves, manifestly indicate a disposi-
tion on the part of the jury to distort the evidence in order to
support the general verdict or make a case favorable to
appellee.

Counsel next insist that the damages assessed were ex-
cessive. The verdict was for $4,000. The proof showed that
Rosa A. Polk, the widowed mother of decedent, for
11. whose benefit the action was brought, was fifty-four
years old, with an expectancy of eighteen and twenty-
eight one-hundredths years, when her son was killed. The
son was twenty-four years of age when killed, with an ex-
pectancy of between thirty-nine and forty years. The mother
testified that her son had contributed to her support; that
''since my husband's death, Bernard [the decedent] has been

my sole support. The estimate of $150 a year is about as near as I can tell you." The son was good, industrious and faithful, with no bad habits.

This statement of the evidence presents the facts, relative to the contributions of decedent to his mother existing at the time of his death, as favorably to appellee as the evidence warrants. At the time of the death of her son, Mrs. Polk could have purchased an annuity of $150 a year for less than $2,000. Under such a state of facts, is the amount of this verdict excessive?

In the case of *Louisville, etc., R. Co.* v. *Kemper* (1899), 153 Ind. 618, 630, the Supreme Court quotes upon this subject with approval the words of chancellor Kent, as follows: "Unless the damages are so outrageous as to strike every one with the enormity and injustice of them, so as to induce the court to believe that the jury must have acted from prejudice, partiality or corruption, the court cannot, consistently with the precedents, interfere with the verdict. It is not enough to say, that in the opinion of the court, the damages are too high and that we would have given much less. It is the judgment of the jury, and not the judgment of the court, which is to assess the damages in actions for personal torts and injuries. *Coleman* v. *Southwick* [1812], 9 Johns. *45." To the same effect are the following cases: *Cleveland, etc., R. Co.* v. *Hadley* (1908), 170 Ind. 204; *Hudelson* v. *Hudelson* (1905), 164 Ind. 694; *Creamery, etc., Co.* v. *Hotsenpiller* (1902), 159 Ind. 99; *Mead* v. *Burk* (1901), 156 Ind. 577; *Lee* v. *State* (1901), 156 Ind. 541.

This case, upon the subject of the measure of damages, is somewhat different from one brought by an administrator for the benefit of a widow and children. The case of *Louisville, etc., R. Co.* v. *Wright* (1893), 134 Ind. 509, is similar to this one, and in that case, at page 513, the Supreme Court said: " 'In assessing damages resulting to the wife, children or next of kin, the ability of the decedent to have provided for the support and education of those de-

pendent upon him, the number and degree of kindred mentioned in the statute, and their dependence upon him for support, are important considerations. Although it is not necessary to the maintenance of the action for the next of kin that the decedent should have been under a legal obligation to render them support, it is nevertheless of consequence that their relation and situation should be shown with a view of affording a basis upon which to determine the amount of pecuniary loss sustained.' [*Mayhew* v. *Burns* (1885), 103 Ind. 328.] * * * But it must be plain, upon a moment's reflection, that the measure of damages in a case like this must be different. Here the decedent was under no legal obligation to support the next of kin for whose benefit this suit is prosecuted. In the course of nature, it is not probable that they would have survived him and thus become his heirs; nor can we presume that he would not have married. Their pecuniary loss, therefore, is not such as would have been sustained by a widow and children.''

In the case of *Cleveland, etc., R. Co.* v. *Drumm* (1904), 32 Ind. App. 547, 549, this court said: ''The assessment of damages in such case 'must proceed, not merely upon the pecuniary ability of the decedent, but rather upon the anticipations of pecuniary benefit which the surviving next of kin are shown to have had reasonable ground to indulge.' *Diebold* v. *Sharp* [1898], 19 Ind. App. 474. See, also, *Commercial Club, etc.,* v. *Hilliker* [1898], 20 Ind. App. 239; *Wabash R. Co.* v. *Cregan* [1899], 23 Ind. App. 1; *Louisville, etc., R. Co.* v. *Wright* [1893], 134 Ind. 509.''

In the case of *Commercial Club, etc.,* v. *Hilliker, supra,* at page 243, this court says: ''In an action for death by wrongful act, the question is one solely of pecuniary loss. Damages for the bereavement, for pain, or by way of *solatium* are not recoverable. It being true that the damages in cases like this are limited to the pecuniary loss sustained by the next of kin of the decedent, and there being no legal obligations resting upon the decedent to contribute to such

next of kin, damages will not be presumed but must be affirmatively proved. *Armour* v. *Czischki* [1895], 59 Ill. App. 17; *Diebold* v. *Sharp* [1898], 19 Ind. App. 474.''

This is a strong case in appellant's favor upon this ground of its motion for a new trial. The court further said, at page 245: "Upon the facts as found in this case, the verdict for $2,750 strikes us at 'first blush' as being excessive. The only evidence upon the subject is to the effect that the decedent's earnings were contributed to the mother and were worth to her the sum of $2.50 per week. It was found by the jury that the mother's expectancy of life was a fraction over twenty-eight years. Now if we concede that decedent would, during the whole life of her mother, contribute $2.50 per week, or approximately $125 per year for twenty-eight years, we also know that $2,083.32 will purchase an annuity of $125 upon the life of a person of the age of the mother of decedent. Even this would not be a fair way to arrive at the amount of damage done by the wrongful killing of decedent, because the amount of money which would purchase an annuity during the expectancy of life of the next of kin of decedent equal to the annual contribution to their support by decedent would be an excessive judgment. It would necessarily be cut down and greatly lessened by the contingencies, which this case presents.''

Under the authorities cited, it seems well settled that damages in a case of this kind are limited not merely to the pecuniary loss resulting to the next of kin on account of the death of decedent, but where the decedent was under no legal obligation to support the next of kin for whose benefit the suit is brought that the assessment of damages must proceed rather upon the anticipations of pecuniary benefit which the surviving next of kin are shown to have had reasonable ground to indulge. Counsel for appellee admit that this is so; but they insist that under the proof, taking into account the age of decedent, his habits of sobriety, industry and economy, and his dis-

position and habits in the way of contributing to his mother's support, that the jury had a right to infer that his future earnings, had he lived, would have been greater, and his contributions to his mother larger, and that these matters were all facts to be considered by the jury. But here we are entering the field of speculation. On the other hand, it might be said, with equal reason, that life is uncertain, and sickness or death might have overtaken the son, or the mother might have died, or the son married and reared a family of his own, and that necessity might, in the future have compelled him to lessen his contributions or withhold them altogether; so that the safer rule for both parties, it seems to us, is that the amount of the damages should be predicated upon the conditions existing and the contributions being made by decedent at the time of and prior to his death, as shown by the evidence in the case. We think the authorities cited support this view of the case.

This case presents a state of facts which might very naturally appeal to the sympathy of a juror to such an extent that his verdict might be thereby improperly influenced. We believe the verdict is excessive, and considering the meagerness of the evidence upon which it is predicated, the answers to interrogatories, some of which may fairly be said to indicate a disposition upon the part of the jury to disregard the testimony of appellant's witnesses, the conclusion is irresistible that the jury permitted their sympathy, or something other than the evidence and the law, at least to influence, if not to control them, and that the excessive amount of this verdict is the result of such influence. In such a case justice demands that a new trial should be granted by this court.

Judgment reversed, with instructions to the court below to grant a new trial.